TIMOTHY C. LEAHY, administrator, *vs.* STANDARD OIL COMPANY
OF NEW YORK.

Hampshire.     September 15, 1914. — January 7, 1915.

Present: RUGG, C. J., LORING, DE COURCY, & CROSBY, JJ.

*Negligence,* In use of gasoline, Causing death.  *Joint Tortfeasors.  Evidence,*
To show degree of culpability in action for causing death.

If, as the natural and proximate result of negligence of an employee of a dealer in
gasoline, gasoline is collected in a pit in a certain cellar where it remains, cov-
ered, until six weeks later, when, through negligence of an occupant of the cellar
who knew of its presence, a large quantity of water is permitted to flow into the
pit causing the gasoline to flow out upon the cellar bottom and gas generated
by it to escape so that, when an employee of the occupant opened the door of
a furnace in the cellar, explosions occurred which caused the employee's death,
an action may be maintained by the administrator of the estate of the employee
against the dealer in gasoline to recover for the conscious suffering and death
of his intestate; and where at the trial of such an action the judge refuses to
rule that, if the negligence of the defendant's employee and of the employer of
the plaintiff's intestate were contributory proximate causes of the accident, the
plaintiff is entitled to a verdict, and instead leaves it to the jury to determine
which of the two was the cause of the accident, exceptions to such rulings must
be sustained.

At the trial of an action under R. L. c. 171, § 2, as amended by St. 1907, c. 375, by
the administrator of one whose death was alleged to have been caused by negli-
gence of an employee of the defendant in sweeping gasoline into a pit in a cellar,
evidence is admissible, as bearing on the degree of culpability of the defendant's
employee, to show that the employee stubbornly persisted in so disposing of
the gasoline although persons standing by at the time told him that he should
not do so and suggested to him a proper way in which to dispose of it.

TORT by the administrator of the estate of John O'Rourke to
recover for the conscious suffering and death of the intestate
alleged to have been caused on March 4, 1913, by an explosion of
gas generated from gasoline negligently left by an employee of
the defendant in a pit in a basement which afterwards was occu-
pied by the plaintiff's employer as the "Draper Garage" in
Northampton.  Writ dated July 18, 1913.

In the Superior Court the case was tried before *King,* J.  The
evidence and material exceptions are described in the opinion.

There was a verdict for the defendant; and the plaintiff alleged exceptions.

*J. C. Hammond,* (*W. J. Reilley* with him,) for the plaintiff.

*H. Parker,* for the defendant.

LORING, J.    The plaintiff's intestate, O'Rourke by name, was injured by an explosion of gasoline in the boiler room of a garage in which he was employed, and, after conscious suffering, died as the result of the accident. The garage was owned by the plaintiff's employer, Sullivan by name. The accident happened on March 4, 1913. About six weeks before that (on January 25, 1913) one Morton (an employee of the defendant company) undertook to fill the gasoline tank of the garage. While he was doing so "he was informed by one Dalton, a plumber's helper who was working in the cellar, that the gasoline was flowing into the cellar." The cellar referred to by Dalton was an addition to Sullivan's garage which then was being constructed, not by Sullivan, but by the owner of the garage for Sullivan's use when completed. The cellar or addition was being built for a new steam heating plant for the garage. On the day in question (January 25, 1913), steam fitters, plumbers and electricians employed by the owner, not by Sullivan, were at work in the cellar. In the middle of the cellar floor there was a pit to receive water which might come from the floor of the cellar or from the soil underneath the floor, and was about three feet square and two and a half feet deep. It had no outlet, but there was an "automatic arrangement" for pumping it out when the liquid in it was more than seven inches deep. When the liquid in the pit was seven inches deep the pit held about thirty-three gallons.

The reason for the gasoline flowing into the cellar was Morton's failure to insert the funnel (through which he was pouring the gasoline) into the filler pipe or the mouth of the tank of the garage which held the gasoline. Forty-five gallons of gasoline were in this way spilled upon the cellar floor (as we understand the bill of exceptions), and five gallons went into the tank. Upon being told by Dalton (the plumber's helper) that "gasoline was flowing into the cellar," Morton "took a broom, went down to the cellar and swept the gasoline into the pit. . . . Morton then went upstairs, . . . where he received a check from Sullivan in payment for the gasoline which he had put into the tank." Morton at this

time said to Sullivan that he had forty-five gallons of gasoline to pay for himself, and on being asked how that happened he answered: "I didn't put the funnel in the filler pipe." While Morton was being paid by Sullivan, "one Dunn, a plumber, who was employed on the boiler, but was upstairs when the gasoline was spilled, had caused the doors [of the cellar] to be nailed up." The doors were nailed up as a matter of safety because of the gasoline spilled upon the cellar floor. "The doors remained nailed for some three or four days, when the plumbers, steam fitters and electricians went to work in the cellar and worked with torches and candles around the floor." Sullivan testified that on January 25 he did not go into the cellar (which confessedly was not then in his control), that he was told that "there was gasoline in the cellar" at that time but that he did not know that the gasoline had been swept into the pit.

The addition to the garage was turned over to Sullivan on February 1, "with the fire going" in the heating plant. On February 7 or 14 the plaintiff's intestate, O'Rourke, entered Sullivan's employ. O'Rourke was employed (among other things) to wash cars, to stay at the garage in the evening, and to "fix up the fires when he was leaving to go home." On the evening of March 4, 1913, Sullivan left the garage between six and seven o'clock, leaving O'Rourke in charge. O'Rourke, having occasion to get some warm water to wash a car, went down the stairs to the boiler room and drew off some water from the boiler. This was in accordance with the practice in use at the garage. Seeing that the water in the boiler was too low, he opened the feed valve but did not turn it off because he did not know how to do that. Sullivan returned to the garage later in the evening and was told by O'Rourke that he had turned the water on to the boiler and did not know how to shut it off. Sullivan thereupon went down into the cellar and turned the valve from the feed pipe into the boiler. Finding that the boiler was too full, he opened the cock and let the surplus water in the boiler run on to the cellar floor. As he reached the top of the stairs after doing this, he met O'Rourke, who said that he was going down to put on some coal for the night. For this purpose O'Rourke opened the door of the fire box. Thereupon three explosions occurred, causing the injury here complained of.

An expert testified in substance that the gasoline would remain on the surface of the water and the gasoline vapor (being heavier than air) would stay in the pit "provided the cover of the pit were not removed;" that so long as the vapor remained in the pit there would be no explosion; that the explosion was due to the "water that overflowed the basin;" that the gasoline, being lighter than water, then flowed out of the pit over the floor; that a vaporization of the gasoline ensued and, the vapor coming in contact with the fire, the explosion occurred. He further testified that sweeping the gasoline into the pit was "a very unsafe way" of disposing of it; that if the door of the fire box were opened (while there was a fire in the box) the raising of the diluted gasoline in the pit would be sufficient to cause an explosion.

It is to be inferred from what is stated in the bill of exceptions that when the steam fitters, plumbers and electricians went to work in the cellar with torches and candles three or four days after January 25, there was a cover on the pit. Apart from the testimony of the expert, the only references in the bill of exceptions to a cover of the pit are to be found (1) in Sullivan's testimony. He testified that: "After the 25th day of January up to the 4th of March, the fires were not going into [in] the boiler. The cover was not removed from that pit any time during that period." There is a patent mistake in the testimony. It expressly appears in the bill of exceptions that there was no fire in the boiler on the twenty-fifth of January; it also expressly appears that when possession of the addition was given to Sullivan on February 1, there was a fire in the boiler and that thereafter a fire was kept in the boiler until the fourth of March. The only other reference to a cover of the pit is the reference to it in the testimony of the expert. In giving his testimony the expert said: "We have here a pit with a cover, but the question is whether that cover is on or off at the time these candles are brought near"; and the judge told the expert that he had the right to incorporate that in his answer. Whether the cover was a wooden cover and was floated off by the diluted water and gasoline which Sullivan ran out upon the floor when he undertook to reduce the amount of water in the boiler, or whether it was an iron cover with holes in it through which the diluted water and gasoline ran on to the floor when the pit overflowed, does not appear.

By his sixth, eighth, twelfth and fifteenth requests for rulings *
the plaintiff (in effect) asked the judge to rule that if the negli-
gence of Sullivan and the negligence of Morton (if both were
found to have been negligent) were contributing proximate causes
of the accident, the plaintiff was entitled to a verdict. But in
place of doing so the judge left it to the jury to decide which of
the two was the cause of the accident. The charge was wrong.
That is established by the decision in *Burke* v. *Hodge*, 217 Mass.
182, and cases cited. To avoid a possible misapprehension we
add that of course the rule in the case of actions for defects in
highways is different. See for example *Clinton* v. *Revere*, 195 Mass.
151, 154.

The defendant has undertaken to support the charge of the
judge on the ground that in the case at bar one only of the per-
sons who were guilty of concurrent negligence had been sued.
There is nothing in that contention. If on the facts the plaintiff
had a several right of action against Sullivan and also a several
right of action against the defendant the fact that he chose to
enforce one or both does not affect the question of what facts
he must prove to make out each case.

In addition there are two exceptions to the exclusion of evi-

---

* "6. The test is to be found not in the number of intervening events or
agencies, but in the character, and in the natural and probable connection
between the wrongdoer and the injurious consequence. So long as it affirma-
tively appears that the mischief is attributable to the negligence as a result
which might reasonably have been foreseen as probable, the legal liability
continues."

"8. If two or more wrongdoers negligently contribute to the personal in-
jury of another by their several acts, which operate concurrently so that in
effect the damages suffered are rendered inseparable, they are jointly and
severally liable."

"12. In the practical furtherance of justice, it is a principle of the law of
torts, that where two or more wrongdoers injure another in person or property
by their several acts, all of which are concurrent, and contribute to one wrong,
but which might have been caused by each, then if upon the evidence no dis-
tinction can be drawn between their acts, they are all jointly and severally ·
liable."

"15. If the jury find that Sullivan was negligent in running the water into
the pit, then the negligence of Sullivan and the negligence of the defendant
were concurrent in their operation to produce the injury and this does not
relieve the defendant of liability."

dence which must be sustained.  The plaintiff offered to show that when Morton took the broom to sweep into the pit the gasoline which he had spilled on the cellar floor, an employee of the defendant said to him, "You should take a pail and sponge and sop it up," and that Morton answered: "To Hell with it." Further, that "while Morton was sweeping the gasoline into the pit, Dalton, a plumber's helper, told him he didn't think it was right to put it in there;" and that Morton replied, "Oh, it is all right, I am going to put it in there."  The first count is brought to recover a fine for negligently causing the death of O'Rourke. By the terms of the act under which it is brought (R. L. c. 171, § 2, amended by St. 1907, c. 375), the amount of the fine depends upon the degree of the culpability of the defendant or of his servant.  Where a defendant or his servant persists in his negligence after he is warned against it, the degree of culpability is (or may be found to be) greater than it is in a case where no warning is given.  The evidence excluded was admissible on the degree of Morton's culpability.  If the verdict for the defendant had stood these exceptions would not have been sustained; for in that event the evidence would have been rendered immaterial.  But since the case is to go back for a new trial these exceptions must be sustained.

We have sustained the plaintiff's exception to the charge so far as it was inconsistent with the sixth, eighth, twelfth and fifteenth rulings asked for on the ground that in respect to the matter stated above the charge was wrong.  We do not decide that those rulings are in all respects an accurate statement of the law which is to govern the new trial.

*Exceptions sustained.*